Filed 11/28/23  In re Kylie A. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re KYLIE A., a Person Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, | F086194 |
| Plaintiff and Respondent, | (Super. Ct. No.  20CEJ300080-2) |
| v. | **OPINION** |
| STEVEN A., | |
| Defendant and Appellant. | |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  Amythest Freeman, Judge.

Gino de Solenni, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel C. Cederborg, County Counsel, and Ashley N. McGuire, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Detjen, Acting P. J., Franson, J. and Smith, J.

Steven A. (father) appeals from the denial of his Welfare and Institutions Code section 388[1] petition requesting placement of his daughter, Kylie, with a paternal relative. He also contends the order must be reversed and the matter remanded because the Fresno County Department of Social Services (department) failed to comply with the initial requirements of the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA) and related state statutes. We agree conditional reversal is required for compliance with the ICWA, and in all other respects affirm.

## STATEMENT OF THE FACTS AND CASE

*Referral*

Father and Ashley A., (mother) have one child, Kylie, born in December of 2021. Father and mother were not married and did not have a custody agreement or paternity judgment. Mother had a previous dependency proceeding in which her parental rights were terminated to Liam, a half sibling to Kylie.

On June 16, 2022, sheriff deputies were called to mother's home, where they discovered mother with injuries to her face. Mother claimed father came to her home uninvited and assaulted her before leaving with Kylie. Mother was under the influence at the time. Mother admitted drinking alcohol, but said the methamphetamine pipe found in the home belonged to father. Father claimed he had gone to mother's home because he was concerned that mother had been drinking alcohol and smoking methamphetamine around Kylie. Father wanted to remove Kylie from mother's home, but the two got into an argument and both parents hit each other. Father was arrested for domestic violence and a protective hold was placed on Kylie.

A social worker responded to the scene and asked mother whether there were any maternal relatives Kylie could be placed with. Mother suggested maternal grandmother,

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

Janice P. (hereafter Janice)[2], who was willing to be assessed for placement. Janice was informed a Team Decision Meeting (TDM) would be held the following day and was invited to participate.

The social worker contacted father, who was in custody at the jail. Father informed the social worker that he was Kylie's father, that there was no custody agreement between him and mother, but that his name was on Kylie's birth certificate. Father reported that he lived with his mother and grandmother.

At the TDM the following day, which included social Worker Robert Brewer, father was not present as he was still in custody and would not be released until December 15, 2022. Mother said her three-year relationship with father had been mostly good, and she denied having any current substance abuse issue and had not used any substances in "like 5 years." Mother was asked to drug test, but did not follow through. The department concluded that voluntary family maintenance for mother was inappropriate due to her history of substance abuse, her refusal to drug test, that a methamphetamine pipe had been found in her home, and the ongoing domestic violence between mother and father. Kylie was temporarily placed in Janice's home, pending a final Resource Family Approval (RFA) evaluation. It does not appear that any of father's relatives were considered for placement during the meeting.

*Detention*

On June 17, 2022, the department filed a section 300 petition alleging, pursuant to subdivision (b), that Kylie was at risk of harm due to mother's substance abuse issues and the domestic violence incident that took place the previous day. The petition further alleged Kylie came within the provisions of subdivision (j), abuse of a sibling, since Liam

___

**2** We will refer to various people by first name only to protect their privacy and especially Kylie's privacy.

had been removed from mother's custody in 2020 for similar issues and mother had failed to reunite with him.

The report prepared for detention stated that the department was not offering services to mother but was considering asking the court to bypass reunification services to her. The department considered father an alleged father. At the time of the report, the department did not have a copy of Kylie's birth certificate. Nowhere in the report does it state that the social worker had been in contact with L.P., a paternal aunt. The report does note that both mother and father told the department they did not have any Indian ancestry.

Father was present at the detention hearing June 20, 2022. When asked, he stated he did not have any Native American heritage. Father's counsel represented that father had been present at Kylie's birth, his name was on her birth certificate, and offered to be sworn in and provide testimony to raise his paternity status from that of alleged father to presumed father. The juvenile court declined father's request. Father's counsel alleged both paternal grandmother Shelly, and paternal aunt L.P. had been in touch with the department and requested they be assessed for placement once his paternity status was elevated to that of presumed father. A combined jurisdiction/disposition hearing was set for August 1, 2022.

*Jurisdiction*

The initial report for the jurisdiction/disposition hearing was prepared by a new social worker, Casandra Torres, who had been assigned after the detention hearing. The report stated that, after being placed with Janice, Kylie had been placed in foster care on July 8, 2022, because Janice was unable to continue the placement. The report stated that L.P. had requested placement of Kylie on July 14, 2022, and was provided information for the Resource Family Approval (RFA) orientation. At the time of the August 1, 2022, report, L.P. had not yet submitted the application.

The report stated that the social worker reached out to maternal aunt A.F. on July 22, 2022, who had adopted Kylie's half sibling Liam, to inquire whether she was interested in placement of Kylie. A.F. expressed uncertainty because mother had difficulty with boundaries, and A.F. and her husband were currently caring for five young children.

At the time of the report, mother had still not taken a drug test and the department recommended bypassing reunification services for her pursuant to section 361.5, subdivision (b)(10) and (11).[3] The report also indicated that mother had two additional older children not in her care.

Father was still in custody and, as of the date of the report, the department had not yet obtained a copy of Kylie's birth certificate. Father was still considered an alleged father, and the department recommended he not be offered services as he was only an alleged father (§ 361.5, subd. (a)).[4] The department recommended a permanency planning hearing be scheduled and adoption for Kylie with her current caregivers.

At the jurisdiction hearing which took place August 1, 2022, the juvenile court granted father's request to be elevated to presumed father status and stated it would not make any orders concerning placement at the hearing that day. The juvenile court found the allegations of the petition true and the disposition hearing was set for November 7, 2022.

After the jurisdiction hearing, another social worker, Christina Mares, was assigned to the case and an addendum report prepared. The report, dated October 7, 2022, renewed its recommendation that reunification services be bypassed father, this

---

[3]    Reunification services need not be provided if previous services were terminated as to a sibling or half sibling of the child at issue because the parent failed to reunify (§ 361.5, subd. (b)(10)), or parental rights had been permanently severed as to a sibling or half sibling (§ 361.5, subd. (b)(11)).

[4]    Reunification services need not be provided until father is a statutorily presumed father (§ 361.5, subd. (a)).

time citing section 361.2, subdivision (a), as its basis.[5]  Father was expected to be released from custody on December 15, 2022, and had not yet had any visitation with Kylie.  The report recommended bypass of reunification services for mother as well and that a permanency planning hearing be held.

The report stated that the department had filed a section 388 petition on August 18, 2022, requesting to suspend mother's visitation with Kylie after mother refused to return Kylie at the end of a visit.  It took over two hours for several police officers to retrieve Kylie from mother.  The officers believed mother was under the influence at the time.  An earlier hair follicle test on mother came back positive for methamphetamine.  Visitation was suspended on September 7, 2022.

The report also reflected that a CFT meeting had been held September 2, 2022, in which the RFA unit advised that six relatives had applied for placement of Kylie, all of whom would need to apply for a criminal exemption waiver for possible placement:

> "Specifically the paternal grandmother, Shelly [A.] and the paternal aunt, [L.P.], who reported that both wanted to provide placement and a permanent plan of care for Kylie. When questioned further, the paternal aunt, [L.P.], stated that while she does work full time, she would be utilizing the paternal grandmother, Shelly [A.] to provide care of Kylie while she is working. The paternal grandmother, Shelly [A.] stated that while she wants to provide a permanent plan of care for Kylie, she did report that when her son, [father], is released from incarceration, the plan is for him to come live in her home. In addition, the Department would note that in the Fresno County Criminal Case F22904268 that a Criminal Protective Order was issued on this case on June 20, 2022, in which the mother, [Ashley A.] and the infant, Kylie are protected for the next three (3) years and [father] is not to have contact with either party."

[5]     Section 361.2, subdivision (a) provides, in pertinent part, that when a child is removed from a parent, the juvenile court "shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or condition arose that brought the child within the provisions of Section 300, who desires to assume custody of the child," unless the juvenile court find that placement with that parent "would be detrimental to the safety, protection, or physical or emotional well-being of the child."

The report continued, stating that, "as none of the relative/mentors that have applied for RFA placement of Kylie have been able to proceed and complete the process, the Department has found that it is not appropriate to place Kylie with any of the relative/mentor requests as of the writing of this report."

The report stated that mother and father had reported on June 16, 2022, that they did not have any Native American ancestry; that father had verbally stated at the detention hearing June 20, 2022, that he did not have any Native American ancestry; that mother reported on September 30, 2022, having no Native American ancestry; and that mother, father, Shelly, and L.P. had all been sent letters on October 3, 2022, inquiring about Native American ancestry, "all of whom stated that they are not of Native American descent," prompting the department to request that the ICWA be found not applicable.

The report stated Kylie's caretakers, who wished to adopt her, were meeting all of her needs, Kylie was doing well, and a completed mental health assessment determined she did not need any services.

At some point, the disposition hearing scheduled for November 7, 2022, was vacated and set for a contested hearing on December 5, 2022.

_Father's Motion for Placement and Section 388 Petition_

On November 18, 2022, father filed a statement of contested issues, requesting Kylie be placed with him as the non-offending, non-custodial parent; that she be placed with family members until his release from custody, and that reunification services be provided him. As alleged by father, the department delayed obtaining a copy of Kylie's birth certificate to prove his presumed father status. He also alleged that, prior to Kylie being placed into foster care, the department had determined that L.P. was a likely candidate for placement. According to father, L.P. completed the RFA process, purchased a crib and car seat and babyproofed her home in anticipation of taking Kylie, but a death in the family required her to travel out of state for four days. L.P. had asked

7.

that Janice keep Kylie while she was gone, but Janice was not able to, prompting the department to place Kylie in her current foster home. The new social worker Torres assigned to the case was not forwarded this information by social worker Brewer and instead asked L.P. to redo her RFA submission.

Father also alleged that, even though he was in custody, he should be provided reunification services pursuant to section 361.5, subdivision (e)(1).[6]

On November 21, 2022, father filed a section 388 petition requesting the juvenile court change its August 1, 2022, order, which did not make any placement decisions, and place Kylie with either L.P. or Shelly. The petition alleged L.P. had promptly complied with the request to redo her RFA submission. The petition also alleged L.P. had been informed that there was a "ding" on her record that would not prevent her from having Kylie placed with her. Shortly thereafter, a CFT meeting was held which L.P. attended telephonically. At the meeting, L.P. was informed that the "ding" on her record did prevent Kylie from being placed with her. While L.P. was not informed what the "ding" was, she admitted to having a "DUI 12 years" earlier with a blood-alcohol level of .09 percent. L.P. plead no contest to this and had completed all requirements of the court and the DMV. While the RFA social worker told her there was paperwork to fill out to take care of the "ding," L.P. was not given the form or told what it was. L.P. then contacted the social worker, who stated there was no reason to complete the form as Kylie would not be placed with her.

The petition also alleged that Shelly received a text message from the department that they were not seeking to place Kylie with relatives "at this moment - but you are more than welcome to complete the resource family approval process," although the process would not guarantee placement of Kylie with her.

---

[6] Reunification services can be provided a parent in custody unless it is detrimental to the child (§ 361.5, subd. (e)(1)).

*Disposition*

At the contested disposition hearing on December 5, 2022, before Commissioner Todd Eilers, father was not present but the juvenile court took note that father filed a section 388 petition requesting Kylie be placed with a relative. The juvenile court stated that, upon a discussion with all parties off the record, disposition would take place that day but the issue of placement with the relatives would be reserved for a later date. As stated by the juvenile court, when a placement hearing did take place, it would be up to the department to establish by clear and convincing evidence why Kylie should not be placed with a relative.

As for disposition, the department stated that it was now recommending father receive reunification services, but continued to recommend reunification services for mother be bypassed. Father's counsel voiced father's request for placement of Kylie, but due to his incarceration, requested Kylie be placed with L.P. until he was released from custody.

The juvenile court declared Kylie a dependent of the court and found clear and convincing evidence that she would be at a substantial risk of harm if returned to mother's custody. The juvenile court denied father's request that Kylie be placed with him, finding clear and convincing evidence that such placement would be detrimental to her, citing his current incarceration for domestic violence, a previous conviction for domestic violence, his history of substance abuse, and the criminal protective order in place in which father was not to have contact with mother or Kylie. The juvenile court reserved the issue of relative placement until a later time. Services for mother were bypassed. Father was ordered services and a hearing was set for January 30, 2023, to consider relative placement contained in father's section 388 petition. The department was ordered to complete a full assessment of L.P. and Shelly pursuant to section 361.3. (request for placement of child with relative).

9.

*Post-Disposition Proceedings*

At the request of Kylie's counsel, an investigator for Fresno Child Advocates assessed Shelly and L.P.'s homes on January 17, 2023. Shelly informed the investigator that she had participated in a live scan in November of 2022, but her home had not been assessed by the department. According to Shelly, father was residing in a trailer on paternal grandfather's property. Shelly reported paternal uncle Richard S. Jr. also lived in the home, as well as Richard Jr.'s girlfriend, a friend of the family and a paternal great-grandparent as well. Shelly reported a conviction for drug and firearm possession 30 years prior and a DUI in 2018.

The investigator reported that L.P.'s home, which was clean, had two bedrooms, one bathroom, a living room, dining room, and kitchen. L.P. planned to have Kylie sleep in her room, which had a bed, a dresser, and a crib. Richard S. Sr., the father of the paternal uncle Richard Jr., lived in the home with L.P. L.P. informed him that he would have to find a different living arrangement if Kylie continued to be placed with her past infancy.

L.P. told the investigator that she had been having supervised once a month visits with Kylie, who enjoyed the visits once she warmed up to L.P.

L.P. worked full time as a dental assistant and planned on enrolling Kylie in daycare and on utilizing Shelly for daycare. If the department did not want her to use Shelly for daycare, L.P. stated she would enroll Kylie in daycare and she also had two aunts who could provide care. L.P. stated that she was willing to abide by all court orders and keep proper boundaries with the parents. She was willing to be protective of Kylie and would call law enforcement or the department if mother or father ever attempted unauthorized contact with Kylie.

*Addendum Report*

On January 27, 2023, the department filed an addendum report objecting to the section 388 petition requesting Kylie be placed with L.P. or Shelly as it alleged removing

Kylie from her current caretakers would be detrimental. According to the department, it had attempted to obtain information from the paternal relatives from the inception of the proceedings, that the paternal relatives were given multiple opportunities to be assessed as far back as June of 2022, but that they had been uncooperative, inappropriate, and untruthful regarding their living situation by withholding information from the department.

The report claimed that, as of the date of the report, "none" of the paternal relatives were approved for placement, and even if they were approved, the department recommended that Kylie remain in her current placement as it would cause unnecessary trauma to remove her. Kylie had been in her current placement since July 8, 2022.

The report gave consideration to the factors listed in section 361.3, for assessing preferential relative placement. With respect to the wishes of the parents and relatives regarding placement (§ 361.3, subd. (a)(2)), while father wanted Kylie placed with either Shelly or L.P., mother had asked in August of 2022 that Kylie not be placed with L.P. or Shelly, as Shelly had been violent with mother in the past and she had criminal history. At that time, mother alleged father would be living with Shelly when he was released, and she did not think either Shelly or L.P. would protect Kylie from him.

The report stated that, when L.P. informed the department that she was interested in placement of Kylie on July 15, 2022, she said that she had attempted to complete the RFA application by following a You Tube video orientation, but was unable to complete the process because it stated she needed to complete the Live Scan fingerprinting prior to submitting the application. According to the report, when social worker Brewer spoke to L.P. on June 22, 2022, and requested she be present at the CFT scheduled for June 27, 2022, L.P. told Brewer she needed to first have a discussion with her partner, who was not in agreement with the idea of the placement. On July 18, 2022, Brewer attempted to obtain L.P.'s information via email in order to begin a background check, but L.P. did not provide this information to social worker Torres until August 11, 2022. At that time, the

11.

RFA unit reported that all of the adults on the placement application had criminal history, which would require exemptions. At the subsequent CFT on August 26, 2022, Shelly and L.P. were informed that they needed to follow up for instructions to obtain exemptions. L.P. denied having any criminal history.

On December 1, 2022, L.P. and housemate Richard Sr. completed their Live Scans. The department alleged L.P. had not disclosed Richard Sr.'s name, but it was provided to the department via father's attorney. On January 3, 2023, the department informed L.P. and Richard Sr. that both needed "a [s]implified exemption," which were pending at the time of the report. L.P.'s home inspection was completed January 17, 2023, and her home met the requirements.

With respect to the good moral character of applicants, whether any individual residing in the home had a prior history of violent criminal acts (§ 361.2, subd. (a)(5)), the department claimed L.P. had not been fully truthful or forthcoming during the process. The department noted that, in August 2022, L.P. informed the department no other adult was living in her home, although she had initially said an unnamed adult lived with her and then refused to provide the social worker with that information. L.P. had also claimed in August 2022 that she did not have any criminal history. L.P. was observed by the department during a CFT to belittle and make inappropriate comments to mother, causing the department concern that her behavior "would not support family reunification or visitation with mother."

As for Shelly, the report concluded that it could not move forward on her request for placement as she had yet to provide the department with needed information.

The report concluded that the department was unable to establish or determine that placement with either Shelly or L.P. would be appropriate "as there continues to be concern for protective capacity, appropriate boundaries with the parents, and withholding information that could potentially pose a risk to the safety of [Kylie]."

12.

*Hearing on Father's Section 388 Petition*

The hearing scheduled for January 30, 2023, was continued to March 2, 2023. At the contested hearing before Judge Freeman, the initial social worker, Brewer, testified L.P. had contacted him after Kylie was placed into protective custody. According to L.P., she was a traveling nurse and had been unsure she could take placement of Kylie until she spoke with her partner. While placement had been made with Janice, Brewer told L.P. he would be in touch if anything "f[e]ll through." Brewer did not hear back from L.P. When L.P. left town, Brewer assumed it was for her work as a traveling nurse, as she had said she was going "back East for work." Brewer did not recall if he had been the individual who sent L.P. the original RFA approval link.

According to social worker Brewer, Janice, the maternal grandmother, was the first option for placement because he spoke to her first. He considered L.P. a second choice, because he had spoken to Janice first. As a result, Kylie was placed with Janice.

Father testified that he had been present at Kylie's birth and signed paternity paperwork in the hospital. He had been in custody at the time of the detention hearing and was released on December 16, 2022. The department sent him a few packets of paperwork while he was in jail, but he had not received any visitation with Kylie while in custody. Since his release, he had been living at his father's home and participating in reunification services. Father wanted to reunify with Kylie. He had three other children, ages 16, 10, and six, who resided with their mother and with whom he had unsupervised visitation.

Shelly testified that she requested placement of Kylie, with whom she was having monthly supervised visits. Shelly testified that she would be able to provide a permanent plan of adoption for Kylie if father did not reunify with her. Shelly had not yet been approved for RFA, claiming that, when she went to complete the "enhanced screening," she was told only L.P. or she could go through the process, not both of them. Shelly lived about six miles from L.P. and could help out with childcare. Shelly had been a

13.

retail manager for 23 years. Her home had not yet been approved, which included another son, two grandchildren, her daughter-in-law, a 15-year-old friend of the family, and her mother.

L.P. testified that she visited Kylie within a few days of her birth, when mother and father brought her to Shelly's home. L.P. claimed no one contacted her when Kylie was placed into protective custody, but she was informed by Shelly. L.P. contacted social worker Brewer soon after.

L.P. said she was not a traveling nurse and she did not know where social worker Brewer came up with that information. She informed Brewer she had worked in a dental office for 17 years and did not travel for work, but had gone to Oregon for a few days for a death in the family. She had never been to the "East Coast."

L.P. testified that, in order to have Kylie placed with her, social worker Brewer sent her the link to complete the RFA process, but the link required that she be fingerprinted in order to complete the application. L.P. informed Brewer she had recently been fingerprinted for her employment, but was told she needed to complete a Live Scan. L.P. had gone to several locations to complete the Live Scan but was told they could not complete the process because they needed a specific number in order to forward the results. After Brewer was reassigned, L.P. had to contact the next social worker on her own initiative and no one from the department reached out to her.

The subsequent social worker, Torres, had tried to help L.P. get rapid placement. The information L.P. had provided Brewer was not forwarded to Torres. L.P. did not find out where to go for her Live Scan until after the court proceedings in December of 2022. L.P. claimed the department informed her in July of 2022 that, even if everything went through and her house approved, it did not mean Kylie would be placed with her. She claimed she was now approved for placement.

L.P. was having supervised visits with Kylie one hour each month and the visits went well. She had requested unsupervised visits with Kylie, but her request was denied.

14.

L.P. claimed no child welfare history. She had to get an exemption as part of the RFA process due to a "DUI in 2011" for being ".1 over the legal limit." L.P. continued to seek placement of Kylie, believing it would benefit her to be placed with a family member so that she could be around her siblings, grandparents, aunts, and uncles. L.P. was willing to abide by any court order in case father did not reunify with Kylie, and she was also willing to adopt Kylie. L.P. testified she received an RFA certificate for her home. Her housemate Richard Sr. had completed his request for an exemption but had not received his exemption certificate yet. If he was unable to get an exemption, L.P. claimed she would require him to move out.

L.P. testified that she did not hesitate about requesting placement of Kylie when she initially spoke to social worker Brewer, but simply wanted to inform her partner first. She insisted that she provided Brewer with all necessary information about herself the very first time she had contact with him.

Christina Mares, the current social worker, had been assigned the case on August 10, 2022. Mares testified that, at the time, Kylie was doing well in her placement. It had been reported to her that, before and after visits with father, Kylie would become quiet and a mental health assessment was scheduled for her. L.P. told Mares in late August of 2022 that she was okay with Kylie staying at the caretaker. Mares believed it would be detrimental to move Kylie to another placement. Both L.P. and Shelly began visiting with Kylie in October 2022 and there were no reports of Kylie having any issues with the visits.

L.P. was recalled to the stand and testified that she never informed social worker Mares that she did not want placement of Kylie. Instead, L.P. claimed the department informed her that Kylie was not going to be placed with any parental relatives and would be staying with her current caregivers. L.P. stated that she told Mares, "I want what is best for my niece."

15.

At the conclusion of testimony, the juvenile court stated it was father's burden to establish the section 388 petition. Following a discussion off the record, the juvenile court stated it had reviewed the minute order from December 5, 2022, which stated that a contested disposition hearing took place and father's request for placement was denied at that time, with another hearing set for the section 388 petition on January 30, 2023. The juvenile court then reiterated that it was father's burden of proof.

Father's counsel argued the issue of relative placement preference and that the department knew of L.P.'s request for placement since the inception of the case. Counsel pointed out that Kylie had many siblings whom she had visited and she would be able to maintain those relationships if placed with L.P.

The department argued that it had assessed the relatives and any delays were attributable to the paternal relatives. Since the proceedings now involved disposition and no placement change was necessary, the department claimed it was not required to place Kylie with a relative. The department argued it had no documentation of Richard Sr.'s exemption and, as such, L.P.'s home was not yet approved.

Kylie's counsel argued that there had been a change in circumstances, that of L.P. obtaining an exemption. Counsel argued that the record clearly showed that L.P. expressed an interest in Kylie early on in the proceedings and she had been visiting Kylie. While counsel acknowledged that there was not a great bond between L.P. and Kylie, the one hour a month visitation did not allow for such. Counsel felt that it was a close call and could see the case "going either way." She believed L.P. had established enough to show she could care for Kylie.

Mother's counsel argued in support of the department's position.

The matter was continued to again allow the juvenile court time to review the transcript of the December 5, 2022, hearing before making its ruling, "[b]ecause there's confusion about the procedure in which this hearing came about."

16.

On March 15, 2023, the matter resumed. Judge Freeman stated the court had been unable to review the transcript of the December 5, 2022, hearing but, since Commissioner Eilers made all the disposition rulings at the disposition hearing, Judge Freeman concluded that this was a hearing on father's section 388 petition and it was his burden to establish a change in circumstances or new evidence and that the petition was in the best interests of the child.

According to the juvenile court:

> "Being as though Commissioner Eilers made all the findings and orders required for a disposition hearing, I am treating this ruling as the JV-180 only, not as disposition. And even with Commissioner Eilers's note that that issue was reserved for 1/30/2023, I am interpreting that as the JV-180 was being continued to be heard on that date.

> "Being such, it is father's counsel's burden to prove that there's a change of circumstances or new evidence, and that the request made in the JV-180 is in the best interests of the child.

> "In this case, the evidence that was presented to the Court at this point doesn't even meet the first burden of a change of circumstances -- which could be different today, because both aunt and grandma were in the process of being approved and they could be approved as of today. But even if there is the changed circumstance of approval for the RFA, in order to have a placement change of the child I need to find that it is in the best interests of the child.

> "And that's where I believe that the evidence is lacking. Kylie is one-year-old, and is in a placement that is providing her stability at this time. Moving her to another placement -- even if it's a relative, I do not find that it is in her best interests.

> "She has been in her current placement for nine months. She has a strong relationship with her care providers, and they continue to meet all of her physical, psychological, educational, developmental, medical and emotional needs.

> "That being said, it is this Court's goal -- it is this Court's responsibility to do everything possible to reunify children with their parents. And from my review of all the prior hearings in this case, it would seem that there is a six-month review hearing on June 5, 2023.

17.

"[My goal] would need to see [father] progressing, doing well, and not continue to move Kylie around from placement to placement, and to not focus on those things as much as focus on the long-term goal of getting her reunified with her parents.

"So the JV-180 is denied today …."

The juvenile court then asked mother if she had any Native American ancestry, stating that it knew mother had been asked before, "but never by me." Mother replied that she had "Cherokee," but was not sure which location but had been speaking with her elderly mother about it. When asked if it would be beneficial for someone to talk to her mother and see if they could get some information, mother replied "it was Oklahoma, Arizona – there was blood on both sides." She stated that her mother's great-grandfather was "100 percent Cherokee" but she was not certain which side. Mother provided the juvenile court, when asked, with her mother's maiden name and grandfather's name. When asked if she had any living relatives who could provide detailed information, mother stated she had an aunt D.T., who lived in Lindsay, she was "trying to reach out to" but she had not located her number yet. The juvenile court asked that mother put her aunt in contact with the department when she got her number. Mother also provided the court with the name of a cousin, C.C., and the name and number of her mother, M.H.

## DISCUSSION

### I. DENIAL OF FATHER'S SECTION 388 PETITION

Father contends the juvenile court failed to apply the relative placement preference pursuant to section 361.3 when it denied his section 388 petition requesting placement of Kylie with L.P.[7] As argued by father, the department failed to timely follow through on L.P.'s request for placement of Kylie, and when the juvenile court "finally considered L.P.'s request," via father's section 388 petition, "it applied the wrong standard in evaluating the request." Father contends, "Instead of independently assessing the request

---

[7] While father's section 388 petition argues for placement of Kylie with either L.P. or Shelly, his argument on appeal centers around his request for placement with L.P.

18.

pursuant to the relevant statutory criteria under section 361.3, the court imposed a false standard by requiring [him] to meet the requirements of a section 388 petition." Father contends the court's failure to consider the section 361.3 factors in its decision was reversible error. In the alternative, father argues the juvenile court abused its discretion when it found no changed circumstance as required by section 388. We reject both of father's claims.

*Applicable Law*

At a hearing on a section 388 petition seeking to change a child's placement, the moving party must show a change of circumstances or new evidence and that a change in placement is in the child's best interests. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).) A modification petition is addressed to the sound discretion of the juvenile court and its decision will not be disturbed on appeal in the absence of a clear abuse of discretion. (*Id.* at p. 318.) A proper exercise of discretion is " 'not a capricious or arbitrary discretion, but an impartial discretion, guided and controlled in its exercise by fixed legal principles ... to be exercised in conformity with the spirit of the law[,] and in a manner to subserve and not to impede or defeat the ends of substantial justice.' " (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1066.) Exercises of discretion must be " 'grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue.' " (*F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 15.) " 'The denial of a section 388 motion rarely merits reversal as an abuse of discretion.' " (*In re Daniel C.* (2006) 141 Cal.App.4th 1438, 1445, quoting *In re Amber M.* (2002) 103 Cal.App.4th 681, 685–686.)

The section 361.3 relative placement preference requires "preferential consideration" be given to a relative's request for placement of a dependent child. (§ 361.3, subd. (a).) " 'Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1).) "Preferential consideration 'does not create an evidentiary presumption in favor

of a relative, but merely places the relative at the head of the line when the court is determining which placement is in the child's best interests.' " (*In re Antonio G.* (2007) 159 Cal.App.4th 369, 376.) "[T]he statute expresse[s] a command that relatives be assessed and *considered* favorably, subject to the juvenile court's consideration of the suitability of the relative's home and the best interests of the child." (*Stephanie M., supra,* 7 Cal.4th at p. 320.) But this command is not a guarantee of relative placement. (*In re Joseph T., Jr.* (2008) 163 Cal.App.4th 787, 798.)

The preferential consideration rule applies "[a]t the outset of the case and during the reunification period." (*In re Maria Q.* (2018) 28 Cal.App.5th 577, 591.) " 'Appellate court decisions have consistently held that the relative placement preference applies at least through the family reunification period. [Citations.] During the reunification period, the preference applies regardless of whether a new placement is required or is otherwise being considered by the dependency court.' " (*Id.* at p. 592.)

"When considering whether to place the child with a relative, the juvenile court must apply the placement factors, and any other relevant factors, and exercise its independent judgment concerning the relative's request for placement." (*In re Isabella G.* (2016) 246 Cal.App.4th 708, 719 (*Isabella G.*).) Factors to consider in evaluating a placement include, but are not limited to, (1) the best interest of the child, (2) the wishes of the parents, (3) proximity of the placement for visitation and reunification with the parents, (4) placement of any siblings and half siblings in the same home, (5) the good moral character of the relative, (6) the nature and duration of the relationship between the child and relative, (7) the relative's ability to provide appropriate and safe care of the child and facilitate visitation with the child's other relatives, and (8) the safety of the home. (§ 361.3, subd (a)(1)–(8).) "The linchpin of a section 361.3 analysis is whether placement with a relative is in the best interests of the minor." (*Alicia B. v. Superior Court* (2004) 116 Cal.App.4th 856, 862–863.)

<u>Analysis</u>

Father relies on *In re R.T.* (2015) 232 Cal.App.4th 1284, to argue the juvenile court abused its discretion in refusing to change Kylie's placement. The appellate court in *R.T.* reversed the lower court's decision to deny a relative's section 388 petition which sought placement after reunification services had either been bypassed or terminated. (*Id.* at pp. 1299–1301.) The father in *R.T.* identified relatives early in the case, and the relatives responded promptly, despite agency inaction. The father had identified two paternal aunts who wished to be considered for placement, but the newborn minor was placed with a nonrelated extended family member instead. At the disposition hearing, the court denied reunification services, set the matter for a permanency hearing, rejected both parents' requests to place the infant with one of his paternal aunts, and instead ordered the infant to remain with the nonrelated extended family member. The agency was aware of the aunts' interest in placement before the minor was even one month old, and their home inspections were completed before he was three months old. (*Id.* at p. 1293.) A month later, one of the aunts filed a section 388 petition expressing her desire to adopt the minor, claiming she had been denied preferential consideration for placement. (*Id.* at pp. 1293–1294.) The court took eight months to conduct a hearing on the aunt's section 388 motion. A caseworker testified that the agency never considered the aunts for placement, despite having conducted a home assessment. (*Id.* at p. 1294.) The appellate court acknowledged that it was "presently unsettled" whether a relative is entitled to preference under section 361.3 when the request is made after reunification services have been terminated. (*Id.* at p. 1300.) Because both the agency and the court erroneously failed to give the relatives preferential consideration earlier in the case, when the error was subsequently raised by a section 388 motion, "the court should have directed the agency to evaluate the relatives for placement under the relevant standards [citation] and, upon receipt of the evaluation and the agency's placement recommendation, exercised its independent judgment to consider if relative placement was appropriate." (*Ibid.*)

Father also relies on *Isabella G., supra,* 246 Cal.App.4th 708, in which the child's paternal grandparents sought custody immediately after detention. The agency failed to assess their home and compounded its error by falsely informing the grandparents there was a mandatory one-year waiting period before the child could be moved from the foster family with whom she had been placed. (*Id.* at pp. 713–714.) After being repeatedly rebuffed in their efforts to obtain custody, the grandparents hired a lawyer, who filed a section 388 petition after reunification services had been terminated. (*Id.* at p. 715.) The appellate court followed *R.T.*, reasoning that the grandparents had "requested placement prior to the detention, jurisdictional and dispositional hearings," "before the 12–month review hearing," and "after the case was referred for a section 366.26 hearing," and the agency refused to comply with its obligation to conduct a home assessment on any of those occasions, "disregard[ing] the legislative preference for relative placement throughout [the] dependency case." (*Id.* at pp. 722–723.) The court reversed the order denying the grandparents' section 388 petition and directed the court to consider relative placement under section 361.3, as it should have done earlier in the case. (*Id.* at pp. 724–725.)

In both *R.T.* and *Isabella G.*, the relatives were known to the social services agencies but were not considered as placement options during the early stages of the case, as required under section 361.3. Here, in contrast, the record contains evidence of the department's efforts to locate and assess potential relative placement for Kylie from the inception of the case. When Kylie was first removed from mother and father's care in June of 2022, the social worker located and placed Kylie with maternal grandmother Janice later that same day, pending the RFA evaluation.

L.P. was contacted promptly by the department two days after the detention hearing. She was provided information about the RFA process, but stated she needed to confer with her partner, and she did not, at that time, provide the requested necessary information.

When Kylie was in need of a new placement in early July 2022 (maternal grandmother elected not to take placement due to being afraid of father threatening her family's safety), Kylie was placed with the current care providers because no other relative had provided the necessary information for emergency placement.

The department made additional attempts to place Kylie with other maternal family members, but they declined placement.

When L.P. requested placement of Kylie on July 14, 2022, she represented that there was one other adult living in her home. On July 18, 2022, the department attempted to request information necessary for background checks. On August 5, 2022, Sally requested placement of Kylie, but only if L.P. was not able to. Sally reported six adults living with her, but did not provide the necessary information for assessments and clearances. On August 11, 2022, L.P. provided information for backgrounds checks.

Sally and L.P. attended the CFT meeting on August 26, 2022, and were informed by the department that L.P. had a criminal conviction which would require an exemption in order to be approved for placement. L.P. denied the conviction existed. It was further discovered that all of the other adults on the application required exemptions. L.P. reported that Sally would be the primary care giver for Kylie due to L.P.'s work schedule. Sally informed the department that father was going to continue to reside in her home once he was released. The department came to find out that there was an active criminal protective order against father protecting mother and Kylie until 2025.

In October of 2022, Sally informed the department that she wanted to begin the RFA process. L.P. testified at the section 388 hearing that she did not get the proper instructions on how to complete the RFA process until November of 2022. The department never did receive the information of the individual residing with L.P. as requested, and instead learned of his identity, Richard Sr., through father. It was reported that both L.P. and Richard Sr. needed exemptions for their past criminal convictions to receive RFA approval.

23.

By the time of the contested disposition hearing, held December 5, 2022, neither L.P. nor Sally had been RFA approved or had exemptions granted by the department. When the juvenile court ordered the department assess Sally and L.P. for placement under section 361.3, father's counsel informed the juvenile court that Sally only wanted placement if L.P. could not. Despite the department's efforts in the six months leading up to the disposition hearing, neither Sally nor L.P. promptly or diligently made efforts for placement approval.

Prior to disposition, father made a motion to change a court order under section 388 to request placement of Kylie with L.P. However, the hearing was continued without objection to March 2, 2023, likely to allow Sally and L.P. to complete the RFA process and receive approval.

After disposition, the department continued to assist L.P. and Sally in completing the RFA process. Sally had wanted to complete the process under L.P.'s "home," but was informed that she could not. At the end of December 2022, the department received information from Sally that she had only the paternal great grandmother living in her home. This was contrary to her August 2022 statement that there were six adults in her home. In January of 2023, Sally represented that there were four other people living in her home; one other adult informed the department that there were three other adults in the home.

At the hearing on the section 388 petition, it was reported that L.P.'s home met the "Health and Safety Assessment required for the RFA," but the exemptions were still pending. Sally's home had not yet been approved.

Thus, the juvenile court found, pursuant to section 388, that there had been no change in circumstances, as neither L.P. nor Sally were considered approved by the department, and therefore did not meet the "first burden of a change of circumstances." The juvenile court further stated that, "even if there is the changed circumstance of approval for the RFA, in order to have a placement change of the child I need to find that

it is in the best interests of the child" "[a]nd that's where I believe that the evidence is lacking."

However, whether consideration of placement with L.P. in this case is properly determined in accordance with section 388 or the relative placement preference in section 361.3 is of no moment here. Section 361.3 requires that the juvenile court consider a number of factors, the first of which is "[t]he best interest of the child." (§ 361.3, subd. (a)(1).) Section 388 similarly requires consideration of the child's best interests. (§ 388, subd. (d).)

While the juvenile court cited section 388 rather than 361.3 in its ruling on father's request, it is evident it nonetheless considered the pertinent statutory factors in making its decision. The juvenile court impliedly addressed the statutory factors of section 361.3 when it specifically recognized the special needs of Kylie in considering her young age, "one-year-old," and her need for constant care and stability, something the juvenile court found she had with her current care provider. (§ 361.3, subd. (a)(1).) The juvenile court also took the wishes of both mother and father into consideration. (§ 361.3, subd. (a)(2).) It was obviously aware of father's request that Kylie be placed with L.P. In an addendum report before the juvenile court, mother stated that she did not want Kylie placed with Sally or L.P. because Sally had a tendency to be violent and neither would protect Kylie from father. Neither L.P. nor Sally's homes had been approved, nor had all the inhabitants received exemptions, and therefore neither placement met the requirement that they be able to prove "[t]he good moral character of the relative and any other adult living in the home, including whether any individual residing in the home has a prior history of violent criminal acts or has been responsible for acts of child abuse or neglect" (§ 361.3, subd. (a)(5)) or whether the home could provide a "safe, secure, and stable environment for the child" (§ 361.3, subd. (a)(7)(A)). The department had observed that during a CFT, L.P. had belittled and made inappropriate comments to mother, causing the department concern that her behavior "would not support family reunification or

25.

visitation with mother." (§ 361.3, subd. (a)(7).) The focus of the argument advocating placement of Kylie with L.P. was the fact that she was family and L.P. would be able to help Kylie maintain relationships with her half siblings. While this is an important factor, it is not dispositive.

Again, while the section 361.3 statutory factors are important, the "linchpin" is always the best interests of the child. (*In re Robert L., supra,* 21 Cal.App.4th at p. 1068.) Here, the juvenile court noted Kylie's needs were being met in her current placement – "She has a strong relationship with her care providers, and they continue to meet all of her physical, psychological, educational, developmental, medical and emotional needs," and moving her to another placement would not be in her "best interests." The juvenile court stated that its long-term goal was to reunify Kylie with father and "not continue to move Kylie around from placement to placement …."

"The overriding concern of dependency proceedings ... is not the interest of extended family members but the interest of the child. '[R]egardless of the relative placement preference, the fundamental duty of the court is to assure the best interests of the child, whose bond with a foster parent may require that placement with a relative be rejected.' [Citation.] Section 361.3 does not create an evidentiary presumption that relative placement is in a child's best interests. [Citation.] The passage of time is a significant factor in a child's life; the longer a successful placement continues, the more important the child's need for continuity and stability becomes in the evaluation of [his or] her best interests." (*In re Lauren R.* (2007) 148 Cal.App.4th 841, 855.)

Thus, even assuming the juvenile court erred in not applying the relative placement preference in evaluating whether to move Kylie into L.P.'s care, we nevertheless conclude the error was harmless as the record establishes the juvenile court's analysis very closely tracked what it would have done if it had explicitly evaluated the request for placement directly under section 361.3, and it is not reasonably probable conducting its analysis explicitly under the rubric of section 361.3 would produce a more

favorable ruling for father. As noted above, the focus on the inquiry remains on the best interest of the child, and in this case the record strongly supports finding Kylie would be best served by leaving her in the care of her life-long caregivers.

We find no abuse of discretion.

II. ICWA

Father also contends the section 388 petition must be reversed because the juvenile court and department failed to comply with the initial inquiry requirements of the ICWA. We agree that ICWA error occurred, necessitating a conditional reversal of the court's finding that ICWA does not apply.

*Background*

Before the detention hearing, mother indicated that she did not have any Indian heritage. During the detention hearing June 20, 2022, an oral ICWA-020 inquiry was conducted, where father verbally denied Indian heritage and mother did so via her counsel.

The addendum report filed prior to disposition stated that the ICWA did not apply, as mother and father both denied Native American heritage prior to the detention hearing on June 16, 2022; that father stated verbally in court at the detention hearing June 20, 2022, that he did not have any Native American heritage; that on September 30, 2022, mother reported having no Native American heritage on both her maternal and paternal sides of her family; and that a letter inquiring as to Native American ancestry was sent to father, to Shelly, and to L.P. on October 3, 2022, inquiring as to Native American heritage. The report concluded that the department:

> "has made the ICWA inquiry of the parents, and family members, all of whom have stated that they are not of Native American descent, the Department of Social Services would respectfully request that the Court make the finding that ICWA is not applicable to this case according to [25 USC §1903]."

Copies of the letter sent to father, Shelly and L.P. are included in the record.

27.

In the December 5, 2022, orders after disposition, the juvenile court found that Kylie did not come within the provisions of the ICWA.

On March 15, 2023, at the end of the contested section 388 hearing, the juvenile court asked mother about her Native American heritage, stating "I know you have been asked these questions before, but never by me." Mother then said one of her mother's great grandfather was "100 percent Cherokee — full-blooded" located in Oklahoma or Arizona. Mother further provided her mother's maiden name and phone number and the grandfather's name. Mother said she was trying to obtain the phone number for an aunt, who lived in Lindsay, and she had a cousin who might have information. Mother was asked to have the aunt get in touch with the department.

*Legal Principles*

" 'ICWA is a federal law giving Indian tribes concurrent jurisdiction over state court child custody proceedings that involve Indian children living off of a reservation' [citations], in furtherance of 'federal policy " 'that, where possible, an Indian child should remain in the Indian community' " ' [citations]. 'ICWA establishes minimum federal standards, both procedural and substantive, governing the removal of Indian children from their families' [citations], and '[w]hen ICWA applies, the Indian tribe has a right to intervene in or exercise jurisdiction over the proceeding.' " (*In re K.H.* (2022) 84 Cal.App.5th 566, 594, fn. omitted (*K.H.*); accord, *In re E.C.* (2022) 85 Cal.App.5th 123, 138, fn. omitted (*E.C.*).)

" 'In 2006, California adopted various procedural and substantive provisions of ICWA.' [Citations.] The Legislature's 'primary objective ... was to *increase* compliance with ICWA. California Indian Legal Services (CILS), a proponent of the bill, observed that courts and county agencies still had difficulty complying with ICWA 25 years after its enactment, and CILS believed codification of [ICWA's] requirements into state law would help alleviate the problem.' " (*K.H., supra,* 84 Cal.App.5th at p. 595; accord, *E.C., supra,* 85 Cal.App.5th at pp. 138–139.)

" 'In 2016, new federal regulations were adopted concerning ICWA compliance. [Citation.] Following the enactment of the federal regulations, California made conforming amendments to its statutes, including portions of the Welfare and Institutions Code related to ICWA notice and inquiry requirements. [Citations.] Those changes became effective January 1, 2019 ....' [Citation.] Subsequently, the Legislature amended section 224.2, subdivision (e), to define 'reason to believe,' effective September 18, 2020." (*K.H., supra,* 84 Cal.App.5th at pp. 595–596, fn. omitted; accord, *E.C., supra,* 85 Cal.App.5th at p. 139.)

"[W]hether a child is a member, or is eligible for membership, in a particular tribe is a determination that rests exclusively with the tribe, and neither the agency nor the court plays any role in making that determination. [Citations.] ' "Because it typically is not self-evident whether a child is an Indian child, both federal and state law mandate certain inquiries to be made in each case." ' " (*K.H., supra,* 84 Cal.App.5th at p. 596; accord *E.C., supra,* 85 Cal.App.5th at pp. 139–140.)

"In California, section 224.2 'codifies and elaborates on ICWA's requirements of notice to a child's parents or legal guardian, Indian custodian, and Indian tribe, and to the [Bureau of Indian Affairs].' " (*In re A.R.* (2022) 77 Cal.App.5th 197, 204.) California law imposes "an affirmative and continuing duty [on the court and the county welfare agency] to inquire whether a child for whom a petition under [s]ection 300, ... may be or has been filed, is or may be an Indian child." (§ 224.2, subd. (a).)

"The [state law] duty to inquire begins with the initial contact, including, but not limited to, asking the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child." (§ 224.2, subd. (a).) "If a child is placed into the temporary custody of a county welfare department pursuant to [s]ection 306 ... the county welfare department ... has a duty to inquire whether that child is an Indian child. Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the

child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b).) Additionally, "[a]t the first appearance in court of each party, the court shall ask each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child. The court shall instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child." (§ 224.2, subd. (c).)

"If the initial inquiry provides 'reason to believe' that an Indian child is involved in a proceeding—that is, if the court or social worker 'has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe'—then the court or social worker 'shall make further inquiry' regarding the child's possible Indian status as soon as practicable." (*In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 999 (*Ezequiel G.*), citing § 224.2, subd. (e).) "Further inquiry 'includes, but is not limited to, all of the following: [¶] (A) Interviewing the parents, Indian custodian, and extended family members[;] [¶] (B) Contacting the Bureau of Indian Affairs and the State Department of Social Services[; and] [¶] (C) Contacting the tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility.' " (*Ezequiel G.*, at p. 999.)

"If there is 'reason to know' a child is an Indian child, the agency shall provide notice to the relevant tribes and agencies in accordance with section 224.3, subdivision (a)(5)." (*Ezequiel G., supra,* 81 Cal.App.5th at p. 999, citing § 224.2, subd. (f).) "There is 'reason to know' a child is an Indian child if any one of six statutory criteria is met— i.e., if the court is advised that the child 'is an Indian child,' the child's or parent's residence is on a reservation, the child is or has been a ward of a tribal court, or either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe." (*Ezequiel G.*, at p. 999, citing § 224.2, subd. (d).)

County welfare departments "must on an ongoing basis include in its filings a detailed description of all inquiries, and further inquiries it has undertaken, and all information received pertaining to the child's Indian status, as well as evidence of how and when this information was provided to the relevant tribes. Whenever new information is received, that information must be expeditiously provided to the tribes." (Cal. Rules of Court, rule 5.481(a)(5).)[8]

*Standard of Review*

"The juvenile court's finding that ICWA does not apply to the proceeding rests on two elemental determinations, 'subject to reversal based on sufficiency of the evidence.' " (*K.H., supra,* 84 Cal.App.5th at p. 601, quoting § 224.2, subd. (i)(2); accord, *E.C., supra,* 85 Cal.App.5th at pp. 142–143.) First, "[t]he court must find there is 'no reason to know whether the child is an Indian child,' which is dependent upon whether any of the six circumstances set forth in subdivision (d) of section 224.2 apply." (*K.H.*, at p. 601, quoting § 224.2, subd. (i)(2); accord, *E.C., supra*, at p. 143.) Second, "[t]he juvenile court must ... find a 'proper and adequate further inquiry and due diligence ....' " (*Ibid.*)

Under the substantial evidence standard, " 'a reviewing court should "not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts." [Citation.] The determinations should "be upheld if ... supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence." ' [Citations.] The standard recognizes that '[t]rial courts "generally are in a better position to evaluate and weigh the evidence" than appellate courts' [citation], and 'an appellate court should accept a trial court's factual findings if they are reasonable and supported by substantial evidence in the record' [citation]. '[I]f a court holds an evidentiary hearing, it may make credibility

---

**8** All further references to rules are to the California Rules of Court.

31.

determinations, to which an appellate court would generally defer.' " (*K.H., supra,* 84 Cal.App.5th at p. 601; accord, *E.C., supra,* 85 Cal.App.5th at p. 143.)

The juvenile court's finding on the second element, however, "is ultimately discretionary because it requires the juvenile court to 'engage in a delicate balancing of' various factors in assessing whether the agency's inquiry was proper and adequate within the context of ICWA and California law, and whether the agency acted with due diligence." (*K.H., supra,* 84 Cal.App.5th at p. 601, quoting *Caden C.* (2021) 11 Cal.5th 614, 640; accord, *E.C., supra,* 85 Cal.App.5th at p. 143; *Ezequiel G., supra,* 81 Cal.App.5th at pp. 1004–1005.) Therefore, we employ a hybrid standard and review the court's determination for substantial evidence and abuse of discretion. (*K.H.*, at p. 601; accord, *E.C.*, at pp. 143–144; *Ezequiel G.*, at pp. 1004–1005.)

" 'Review for abuse of discretion is subtly different [from review for substantial evidence], focused not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when " ' "the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." ' " [Citation.] But " ' "[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court[.]" ' " [Citations.] [¶] While each standard here fits a distinct type of determination under review, the practical difference between the standards is not likely to be very pronounced.' " (*K.H., supra,* 84 Cal.App.5th at p. 602; accord, *E.C., supra,* 85 Cal.App.5th at pp. 143–144.)

"Review of the juvenile court's findings under the foregoing standards is deferential, but ' "an appellate court [nevertheless] exercises its independent judgment to determine whether the facts satisfy the rule of law." ' [Citations.] Where the material facts are undisputed, courts have applied independent review to determine whether ICWA's requirements were satisfied." (*K.H., supra,* 84 Cal.App.5th at p. 602; accord *E.C., supra,* 85 Cal.App.5th at p. 144.)

32.

*Analysis*

In the present case, mother and father initially both denied having Indian ancestry. Mother's denial was represented by the social worker and then by counsel at the initial detention hearing when she was not present. Father's mother and aunt were both asked and denied any Indian heritage. At the disposition hearing, the juvenile court found ICWA did not apply. However, when mother was asked at the section 388 hearing, she represented that she did have Indian heritage and provided information to that effect. Up until that time, however, no other maternal relatives had been asked about possible Indian heritage, although the department placed Kylie with maternal grandmother and numerous other relatives were contacted regarding placement.

In *K.H.* and *E.C.*, we addressed ICWA error at the inquiry stage. There, we explained our decision not to follow the approaches articulated by other appellate courts for determining whether ICWA error requires reversal and concluded that the Supreme Court's decision in *In re A.R.* (2021) 11 Cal.5th 234, supplies the appropriate framework for assessing prejudice in this context. (*K.H., supra,* 84 Cal.App.5th at pp. 607–608, citing *A.R., supra,* 11 Cal.5th at pp. 252–254; accord, *E.C., supra,* 85 Cal.App.5th at p. 152.) Applying the standards we articulated in *K.H.* and *E.C.*, as we discuss below, we agree the department's error is prejudicial and remand for the department to conduct a proper, adequate, and duly diligent inquiry is necessary.

As previously mentioned, when "a child is placed into the temporary custody of a county welfare department ..., the county welfare department ... has a duty to inquire whether [the] child is an Indian child. Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b).) Extended family members include adult

33.

grandparents, siblings, brothers- or sisters-in-law, aunts, uncles, nieces, nephews, and first or second cousins. (25 U.S.C., § 1903(2); § 224.1, subd. (c).)

Here, the department did not inquire of mother's family, which fell short of complying with the plain language of section 224.2, subdivision (b). Accordingly, the juvenile court's finding that ICWA did not apply was not supported by substantial evidence, and its contrary conclusion was an abuse of discretion. (§ 224.2, subd. (i)(2).)

Where, as here, the deficiency lies with the department's duty of inquiry and a juvenile court's related finding of "proper and adequate further inquiry and due diligence" (§ 224.2, subd. (i)(2)), the error is one of state law. (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 742.) "Under the California Constitution, '[n]o judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.)" (*K.H., supra,* 84 Cal.App.5th at p. 606; accord, *E.C., supra,* 85 Cal.App.5th at p. 151.)

" '[T]o be entitled to relief on appeal from an alleged abuse of discretion, it must clearly appear the resulting injury is sufficiently grave to manifest a miscarriage of justice' [citations], and California law generally interprets its constitutional miscarriage of justice requirement 'as permitting reversal only if the reviewing court finds it reasonably probable the result would have been more favorable to the appealing party but for the error.' " (*K.H., supra,* 84 Cal.App.5th at pp. 606–607; accord, *E.C., supra,* 85 Cal.App.5th at pp. 151–152.)

However, in *In re A.R., supra,* 11 Cal.5th at pages 252–253, the Supreme Court "recognized that while we generally apply a *Watson*[9] likelihood-of-success test to assess

---

**9**      *People v. Watson* (1956) 46 Cal.2d 818, 836.

prejudice, a merits-based outcome-focused test is not always appropriate because it cannot always adequately measure the relevant harm.  [Citation.]  In other words, where the injury caused by the error is unrelated to an outcome on the merits, tethering the showing of prejudice to such an outcome misplaces the measure, at the expense of the rights the law in question was designed to protect." (*K.H., supra,* 84 Cal.App.5th at p. 609, italics omitted.)

As we explained in *K.H.*, " 'ICWA compliance presents a unique situation ....' " (*K.H., supra,* 84 Cal.App.5th at p. 608.)  "ICWA is not directed at reaching, or protecting, a specific outcome on the merits." (*Id.* at p. 609; accord, *E.C., supra,* 85 Cal.App.5th at p. 154.)  Rather, " '[t]he purpose of ICWA and related California statutes is to provide notice to the tribe sufficient to allow it to determine whether the child is an Indian child, and whether the tribe wishes to intervene in the proceedings' [citation], and an adequate initial inquiry facilitates the information gathering upon which the court's ICWA determination will rest." (*K.H.*, at p. 608; accord, *E.C.*, at pp. 152–153.) Yet, "while the appealing party is usually a parent, parents do not bear the burden of gathering information in compliance with ICWA [citations], and parents may raise the claim of error for the first time on appeal." (*K.H.*, at p. 608; accord, *E.C.*, at p. 153.)  Further, the ultimate determination whether a child is an Indian child rests with the tribe, not with a parent, the agency, or the juvenile court.  (*K.H.*, at p. 590; accord, *E.C.*, at pp. 139–140.)  "[W]here the opportunity to gather the relevant information critical to determining whether the child is or may be an Indian child is lost because there has not been adequate inquiry and due diligence, reversal for correction is generally the only effective safeguard." (*K.H.*, at p. 610, citing *A.R., supra,* 11 Cal.5th at pp. 252–254; accord, *E.C.*, at p. 155.)

Here, the department's inquiry, " 'fell well short of that required to gather the information needed to meaningfully safeguard the rights of the tribes, as intended under ICWA and California law' " (*E.C., supra,* 85 Cal.App.5th at p. 156, quoting *K.H., supra,*

84 Cal.App.5th at p. 620), and "[a] finding of harmlessness on this record would necessarily require speculation and 'is at odds with the statutory protections that ICWA and California law intend to afford Indian children and Indian tribes.' " (*E.C.*, at p. 155, quoting *K.H.*, at p. 611.) Therefore, the error is prejudicial and reversal is required.

Accordingly, the juvenile court's finding that ICWA does not apply is conditionally reversed and the matter is remanded. The court is instructed to ensure the department conducts " 'a proper, adequate, and duly diligent inquiry under section 224.2, subdivision[s] (b) [and (e)], and document its inquiry in the record in compliance with rule 5.481(a)(5).' " (*E.C., supra,* 85 Cal.App.5th at p. 157, quoting *K.H., supra,* 84 Cal.App.5th at p. 621.) " 'This should not be interpreted as requiring an exhaustive search for and questioning of every living relative of [Kylie]' but '[w]e leave that determination for the juvenile court in the first instance because it is better positioned to evaluate the evidence provided by the Department. So long as the court ensures the inquiry is reasonable and of sufficient reach to accomplish the legislative purpose underlying ICWA and related California law, the court will have an adequate factual foundation upon which to make its ICWA finding. (§ 224.2, subd. (i)(2).)' " (*Ibid.*)

## DISPOSITION

The juvenile court's finding that ICWA does not apply is conditionally reversed, and the matter is remanded to the juvenile court with directions to order the department to comply with the inquiry and documentation provisions set forth in section 224.2, subdivisions (b) and (e), and California Rules of Court, rule 5.481(a)(5). If, after determining that an adequate inquiry was made consistent with the reasoning in this opinion, the court finds that ICWA applies, the court shall vacate its existing order and proceed in compliance with ICWA and related California law. If the court instead finds that ICWA does not apply, its ICWA finding shall be reinstated. In all other respects, the juvenile court's order is affirmed.